## Berta v. Michener

C.P. of Berks County, no. 04-10259.

*John A. Boccabella,* for plaintiffs.
*Allan R. Kauffman,* for defendants.

GRIM, *P.J.,* April 26, 2005—The matter before the court is plaintiffs' complaint for partial custody. The following are the pertinent facts.

Plaintiff, Pamela Berta (Grandmother), is the maternal grandmother of the subject minor child, Andrew Jason Michener, born May 31, 2000. Plaintiff, Dale Berta (Grandfather), is married to Grandmother and is the child's stepgrandfather. Defendant, Jennifer Michener (Mother), is Grandmother's oldest child and is the child's mother. Defendant, Jason Michener (Father) is the child's father and Mother's ex-husband.

Mother and Father were not married prior to the child's birth. When Mother was pregnant, Father decided to attend a technical school in Arizona. Mother accompanied him to Arizona where the child was born. Father quit school and was unemployed. When the child was three weeks old Mother had to get a job to support the family. Mother became overwhelmed by the pressure of working, caring for a newborn infant, and Father's lack of help. Mother was upset that Father did not even change the child's diapers. They argued frequently. During one of their arguments, Father pushed Mother while she was holding the baby.

Mother asked Grandmother to pick up the child and her to return to Pennsylvania. Father threatened Mother that, if she left him, he would hunt her down and take the child. Nevertheless, Grandparents traveled to Arizona and brought Mother and the child back to Pennsylvania. Father eventually returned to Pennsylvania by himself.

The child was six weeks old when he and Mother went to live with Grandparents. They lived with Grandpar-

ents until September 2003, when Mother got her own apartment. Grandparents provided care for the child whenever Mother needed it during the period when Mother and Andrew lived with them. In October 2003, Father moved into Mother's apartment. He continues to reside there.

After Mother moved out, she initially stayed in contact with Grandparents, and Grandparents continued to provide childcare for Andrew. Without notice to Grandparents, Parents stopped allowing Grandparents contact with the child in June 2004, after the child had stayed with them for a weekend. Grandmother had not perceived any problems in her relationship with Mother.

Grandparents clearly love and adore the child. Mother also testified that the child loves his grandparents and misses them.

Prior to June 2004, the child was having behavioral problems at his daycare. He had outbursts of temper and even threw a chair on one occasion. Grandmother encouraged Mother to make an appointment with the child's pediatrician. Mother delayed in doing so. Grandmother offered to take the child herself but Mother declined her offer. Mother eventually took the child to his pediatrician in March or April 2004. The pediatrician recommended that the child be given more structure. He suggested that the child be placed on a schedule and that certain foods be limited. He also recommended that a strict adherence be paid to the child's nap and bedtimes. The child adjusts better to a structured play rather than free time.

Mother communicated with Grandmother regarding the recommendations but did not give many details to

her. Mother stressed to her that naps and bedtimes had to be enforced.

On the last weekend that Grandparents saw the child, Mother told them that the child must be in bed by 8 p.m. and take an afternoon nap. Grandmother read a story to the child and put him in bed at 8 p.m. The child was excited about visiting Grandparents and would not go to sleep. Grandmother tried several things to get him to go to sleep, including sleeping with him. The child finally fell asleep at 10 p.m.

Grandmother testified that she loves Andrew dearly and would never hurt him. She wants to have a relationship with him. Mother did not give Grandmother any reason for not allowing her to see Andrew.

Grandmother describes her relationship with Father as one of tolerance. She is civil to him and does not believe that she denigrated him in the child's presence. Grandmother does not care for the way Father treated Mother in the past and she has told Mother she does not like him.

Mother and Father married in 2001 so Father could live in a house in Allentown that belonged to one of Mother's relatives. They never lived together during their marriage. Grandmother helped to pay for Mother's divorce in 2002.

Grandfather testified that Andrew has always been glad to see him. The child refers to him as "Pop-Pop." Grandfather dearly loves the child. Grandfather does not care for Father due to the way he had treated Mother.

Mother testified that when she and Father had been living in Arizona their relationship had deteriorated.

They had no money or friends. Mother had called Grandmother to rescue the child and her because she had been their only option. At that time Mother had been working as a waitress in a bar to support the whole family.

Mother believes that Grandmother is very controlling and wants to control her life. In the past Mother allowed Grandmother to be in control because she dislikes confrontations. She believes that her relationship with Grandmother was not a close relationship because she had always been fearful of the consequences in not agreeing with Grandmother.

In the beginning, when Mother and the child were living with Grandmother, Grandmother had asked for permission to do things with Andrew. However, the longer Mother had lived with her, the less Grandmother had requested permission and had just taken control.

Andrew had temper tantrums when Mother lived with Grandmother. Mother believes that Grandmother aggravated the child's tantrums by condoning them; Grandmother allowed the child to do or get whatever he wanted.

Mother had trouble paying for the child's daycare. To help out with the costs, Grandmother watched the child twice per week and during the weekend. During one week when Grandmother did not have contact with the child, Andrew behaved well at the daycare center. Mother believes that this was due to less interruption in the child's routine.

Mother invited Father's family and Grandparents to her residence for the child's birthday in May 2004. Grandmother refused to come because she did not want to so-

cialize with Father's family. Grandmother threw her own party for Andrew.

Mother is disturbed that Grandmother makes negative comments to her about Father. Grandmother has referred to Father as, inter alia, an idiot and a sperm donor.

Mother believes that her relationship with Father is better than it has ever been. Grandmother's opinions about Father and the custody proceeding have caused a lot of stress between Mother and Father. Most of their arguments are about the custody proceeding. Mother thinks that their relationship would likely become contentious if Andrew sees Grandmother in the future.

Mother and Father do not have much extra money. The custody proceeding exhausts their funds. Father has been unemployed since November 2004. Mother has a full-time job and a part-time job on weekends as a waitress.

Father criticizes Mother about her relationship with Grandmother. He believes that she has learned negative behavior from Grandmother and has low self-esteem and confidence.

Mother does not want Andrew to be under Grandmother's control. She wants the child to develop confidence. Therefore, Mother does not want the child to have any contact with Grandmother. She admits, however, that Grandmother and the child established a bond when they were living together and that it continues between the two even after separation. Andrew sees his paternal grandmother and her boyfriend approximately once a month so he continues to have a relationship with a grandparent.

The child currently attends daycare during the week. It costs Mother $468.00 per month. Father watches the child on weekends.

The child suffers from asthma and is sensitive to cigarette smoke. Mother, Father, and the paternal Grandmother's boyfriend smoke; however, no one smokes in the child's presence. Andrew also has a reaction to animal dander. The parties agree that dogs affect him. Grandmother has cats and had them when the child resided with her. Mother contends that feline dander also harms the child; Grandmother maintains that it does not.

Father believes that the problem between Grandmother and him is that Mother chose him over Grandmother. Father thinks that Mother has stopped being a victim and blaming herself for everything. Mother and Father continually fought about Mother's relationship with Grandmother. His relationship with Mother has definitely improved since Grandmother has ceased to be involved in their lives. Father does not want to repair his relationship with Grandparents.

Father testified that on one occasion Andrew had called him a derogatory name that he had heard from Grandmother. Mother, however, has never heard the child address Father by a derogatory appellation.

Father wants the child to attend daycare in order to maintain the child's routine. Andrew enjoys his friends there. Father further believes that, since the child stopped having contact with Grandmother, he has become a lot less combative and complaining.

The assistant director of the child's former daycare facility testified that the child and Grandmother had al-

ways been happy to be together and that she had never seen Grandmother do anything detrimental. The witness saw a dramatic difference in the child's behavior when the child stopped seeing Grandmother. The child would not follow directions and was louder and more aggressive than before.

Gilbert M. Foley Ed.D. performed a psychological evaluation on the child to determine if visits with Grandparents are in his best interests. Dr. Foley met with just Andrew and his parents. Dr. Foley determined that the child has emotional ties to Grandparents. The child spontaneously brought up Grandmother and Grandfather in his conversations with Dr. Foley. Andrew misses them and would like to see them.

Dr. Foley testified that it would not be in the child's best interests to sever his ties with Grandmother and that it would be in his best interests to see Grandparents. Dr. Foley does not know if the relationship between Parents and Grandparents can be repaired or if a reconciliation is possible. It is sufficient for the child's sake if the parties just have a truce. Some degree of compromise is needed for the child's emotional health. Andrew is in a conflict of loyalty and must be sprung from his position in the apex of a triangulation, which is the source of considerable anxiety, ambivalence, and anger for him. Dr. Foley believes that Andrew's behavioral problems are related to the multiple changes and losses and conflict he has sustained.

When a child loses a figure with whom he has emotional ties, it sends a message to him that human relationships are likely to rupture. This prohibits a child from forming close ties in the future. Dr. Foley is very concerned about this situation occurring with Andrew.

In a grandparent custody/visitation case, the guiding polestar remains the child's best interests. *Johnson v. Diesinger,* 404 Pa. Super. 41, 589 A.2d 1160 (1991). Grandparent visitation is preferred unless there are overriding factors. *Bishop v. Piller,* 399 Pa. Super. 52, 581 A.2d 670 (1990), *affirmed,* 536 Pa. 41, 637 A.2d 976 (1994).

In the case sub judice it is undisputed that the child loves Grandparents and Grandparents adore Andrew. Grandmother presents no danger to the health or safety of this young child. Mother and Father relied on Grandmother to care extensively for Andrew. They, in fact, actively encouraged the bond that developed between Grandmother and child.

The problem lies not in the relationship between Grandmother and Andrew, but the lack of a relationship between Grandmother and Father. There is no legal bond between the two; Mother divorced Father several years ago. Therefore, Grandmother does not legally owe Father any duties or obligations.

Father is disturbed that Grandmother does not like him. Needless to state, he does not like Grandmother. However, all parties and witnesses agree that, despite her feelings towards Father, Grandmother treated him civilly. She did not harass him or threaten him. The court cannot order parties to like each other. The most it can do is order parties to treat each other civilly; the parties are already doing so in the instant case.

Father contends that Grandmother makes derogatory remarks about him to the child or in the child's presence. Grandmother denies doing so. Father bases his claim on the fact that once the child had called him a derogatory

name that he had claimed he had learned from Grandmother. No one else has heard the child call Father a derogatory name. Neither does Father cite any other episodes.

If Grandmother denigrated Father in the child's presence, it was wrong. A child deserves to love and respect both of his parents and the other important adults in his life. However, one occurrence or several incidents do not rise to the level of sanctioning a prohibition against contact. The court will order supervised visitation for the initial visits. If nothing untoward occurs, then unsupervised visitation will commence.

Mother and Father attempt to persuade the court that the child's behavior improved when he was no longer in contact with Grandmother, and that the absence of such contact was the reason for the improvement. However, the parents have not presented any evidence that supports this assumption. Grandmother, on the other hand, presented an administrator from the child's former daycare who testified that, after stopping the contact between Grandmother and child, Andrew's behavior actually worsened.

Dr. Foley believes that Andrew's behavioral problems are related to the multiple changes and losses and conflict that he has sustained. One of Andrew's losses is Grandmother. Dr. Foley believes that, if the emotional damage is severe enough, it will affect the child's future relationships. He thinks that it is in Andrew's best interests to have visitation with Grandmother.

Mother and Father are unable to produce any concrete evidence that there would be any detriment to Andrew by spending time with Grandmother. Their concerns are

not substantiated. Grandmother has never interfered with the parenting of Andrew. The child's parents are his primary attachments.

For the above reasons, the court will award partial physical custody of Andrew to Grandparents.

Father believes that Grandmother is mad because Mother chose him. However, this is not a game, and Andrew is not the prize. The court will appoint a guardian ad litem for Andrew to oversee the situation. Andrew is not to be put in the middle by any party. The guardian ad litem will report to the court if the child is being put in the middle of the parties' war.

The parties have raised issues about the child's asthma. Therefore, the court order will provide that no one will smoke in the child's presence and that Grandmother will remove her cats from the areas in which the child will come into contact.

In accordance with the foregoing opinion, the court enters the following order.

## ORDER

And now, April 26, 2005, it is hereby ordered and decreed as follows:

(1) Defendants shall have sole legal and primary physical custody of the minor child, Andrew, date of birth, May 31, 2000.

(2) Plaintiffs shall have partial physical custody of the minor child as follows:

(a) Plaintiffs shall have partial physical custody on alternate weekends from Friday after school or 4 p.m. until Saturday at 7 p.m.

(b) If Grandmother is able to provide childcare on a weekly basis on the same day, she may provide care for the child on that day. Since the child is already in daycare, defendants' time with the child will not be affected. By choosing a designated day, the child will still have an established routine. Grandmother shall notify the guardian ad litem, designated below, of her selection if she desires to exercise her right under this provision.

(c) Plaintiffs shall have one week of uninterrupted vacation each summer with the minor child. Plaintiffs shall provide defendants with their selection under this paragraph by May 1 of each year except for the year 2005 when notice shall occur by June 3, 2005.

(d) At such other times as the parties may agree.

(e) Notwithstanding the foregoing, plaintiffs shall have custody for Grandparents' Day each year from 9 a.m. to 7 p.m. If Grandparents' Day is on the weekend of plaintiffs' custodial period, then plaintiffs may retain custody of the child overnight on Saturday.

(f) In even-numbered calendar years, plaintiffs shall have partial physical custody from December 23 at 9 a.m. or after school until December 24 at 7 p.m. In odd-numbered calendar years, plaintiffs shall have partial physical custody of the child from December 26 at 9 a.m. until December 27 at 7 p.m.

(3) Jeffrey J. Howell, Esquire, is appointed guardian ad litem for the child. He is to resolve any conflicts which may arise between the parties concerning Andrew. His decision is final except that the parties shall always have recourse to petition the court to determine the child's best interests in the event that they believe that the deci-

sion is *clearly* not in the child's best interests. If the court finds that recourse to the court was unreasonable, then counsel fees shall be awarded against that party. Plaintiffs shall pay 50 percent and defendants shall pay 50 percent of Mr. Howell's fees unless Mr. Howell believes that certain parties were unreasonable, in which case the court may assess the costs against the parties in a different proportion.

(4) The parties shall not disparage or denigrate the other parties in the presence of the child or permit others to do so.

(5) Before the implementation of paragraph 2 of this order, Grandparents' partial physical custody periods shall be supervised by R.A.I.S.E. for two periods. The periods shall occur on alternate Saturdays for a period of no less than four hours and at a time to be mutually agreed upon by the supervisor and the parties. Failing agreement, the periods shall begin at 10 a.m. and end at 2 p.m. If two periods have already occurred pursuant to the order dated April 7, 2005, then this provision is moot. The parties shall equally share the costs associated with the supervision.

(6) During Andrew's custodial periods with them, Grandparents shall remove the cats from the areas with which Andrew will come into contact.

(7) No party shall smoke in the child's presence or permit others to do so.